UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

CASE NO. _____

| | |
|---|---|
| **WILLIAM F. JOHNSON and APRIL JOHNSON, on Behalf of Themselves and All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**COMMUNITY BANK, N.A. and FIRST LIBERTY BANK AND TRUST, a division of COMMUNITY BANK, N.A.,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs, William F. Johnson and April Johnson, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendants, Community Bank, N.A. and First Liberty Bank and Trust (collectively, "Community Bank" or the "Bank"), arising from their unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Community Bank.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their

customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  Operating 175 banking centers in New York and Pennsylvania, Community Bank benefited greatly from these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available

and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Community Bank routinely processed such transactions and then charged its customers an overdraft fee of $32 – even when the transaction was for only a few dollars.  This automatic, fee-based overdraft scheme was intentionally designed to maximize overdraft fee revenue for Community Bank.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Community Bank failed to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.      In many instances, these overdraft fees cost Community Bank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually have been overdrawn at the time the overdraft fees were charged, or at the time of the debit transaction.

9.      Thus, it is through manipulation and alteration of customers' transaction records

that Community Bank maximized overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Community Bank.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Community Bank is subject to personal jurisdiction here and regularly conducts business in the Middle District of Pennsylvania, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## THE PARTIES

12.     Plaintiffs, William F. Johnson and April Johnson, are citizens of the Commonwealth of Pennsylvania.

13.     Community Bank, N.A. is a national bank headquartered in Canton, New York. In Pennsylvania, Community Bank, N.A. operates as First Liberty Bank and Trust, a division of Community Bank, N.A.   Community Bank N.A. is the wholly-owned national banking subsidiary of Community Bank System, Inc.

14.     At all times relevant, Plaintiffs patronized the Community Bank branch located at 645 Washington Avenue in Jermyn, Pennsylvania, which is in Lackawanna County.

15.     Among other things, Community Bank is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative Classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts.   Community Bank operates 175 banking centers in New York and

Pennsylvania

## CLASS ALLEGATIONS

16.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality,

adequacy, predominance, and superiority requirements of Rule 23.

17.     The proposed classes are defined as:

> All Community Bank customers in the United States who, within the
> applicable statute of limitations preceding the filing of this action through
> April 30, 2011, incurred an overdraft fee as a result of Community Bank's
> practice of re-sequencing debit card transactions from highest to lowest
> dollar amount (the "National Class").

> All Community Bank customers having accounts at branches in the State
> of Pennsylvania for the purpose of asserting claims under Pennsylvania's
> Unfair Trade Practices and Consumer Protection Law, PA ST 73 P.S. §
> 201-1, *et seq.* (the "Pennsylvania State Subclass") (*see* Fifth Claim for
> Relief, *infra*).

> The National Class and the Pennsylvania State Subclass are collectively
> referred to as the "Classes."

18.     Plaintiffs reserve the right to modify or amend the definition of the proposed

Classes before the Court determines whether certification is appropriate.

19.     Excluded from the Classes are Community Bank, its parents, subsidiaries,

affiliates, officers and directors, any entity in which Community Bank has a controlling interest,

all customers who make a timely election to be excluded, governmental entities, and all judges

assigned to hear any aspect of this litigation, as well as their immediate family members.

20.     The members of the Classes are so numerous that joinder is impractical.   The

Classes consist of thousands of members, the identity of whom is within the knowledge of and

can be ascertained only by resort to Community Bank's records.

21.     The claims of the representative Plaintiffs are typical of the claims of the Classes

in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Community Bank as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Community Bank's misconduct in that they have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of Community Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

22.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

23.     Among the questions of law and fact common to the Classes are whether Community Bank:

a.     Did not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

c.     Did not alert its customers that a debit card transaction will trigger an overdraft fee, and did not provide its customers with an opportunity to cancel such transactions;

d.     Manipulated and reordered transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulated and reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposed overdrafts and overdraft fees when, but for reordering transactions, there would otherwise have been sufficient funds in the account;

g.     Failed to provide customers with accurate balance information;

h.     Delayed posting of transactions by customers using debit cards so that customers were charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.     Charged exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.     Breached its covenant of good faith and fair dealing with Plaintiffs and other members of the Classes through its overdraft policies and practices;

k.     Required its customers to enter into standardized account agreements which include unconscionable provisions;

l.     Converted money belonging to Plaintiffs and other members of the Classes through its overdraft policies and practices;

m.     Was unjustly enriched through its overdraft policies and practices; and

n.     Violated the consumer protection acts of certain states through its overdraft policies and practices.

24.     Other questions of law and fact common to the Classes include:

a.     The proper method or methods by which to measure damages, and

b.     The declaratory relief to which the Classes are entitled.

25.     Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Community Bank's account agreements and other related documents.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

26.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are an adequate representative and will fairly and adequately protect the interests of the Classes.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Community Bank, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Community Bank's misconduct will proceed without remedy.

28.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

**COMMON FACTUAL ALLEGATIONS**

A.      **Community Bank**

29.     Community Bank has over $5.5 billion in assets and operates 175 banking centers in New York and Pennsylvania

30.     Community Bank is in the business of providing its customers with a variety of banking services.  One of the services provided by Community Bank for customers who open a

checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Community Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

31.    Community Bank employs sophisticated software to automate its overdraft system.  This program maximized the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

32.    As a result of Community Bank's manipulation and alteration of customers' transactions records, funds in a customer's account were depleted more rapidly and more overdraft fees were likely to be charged for multiple smaller transactions.  Indeed, overdraft charges were likely to occur at times when, but for the manipulation and alteration, there would have been funds in the account and no overdraft would have occurred.  For example, if a customer, whose account had a $50 balance at the time Community Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction was debited last – consistent with the actual order of transactions – only one overdraft fee would have been assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.    Community Bank's Relevant Customer Documents Regarding Overdrafts**

33.    Plaintiffs and all members of the Classes maintain or maintained a checking

account with Community Bank.   The terms of Community Bank's checking accounts are contained in standardized account holder agreements (the "Deposit Agreement"), presented to its customers on a "take it or leave it" basis, drafted and imposed by Community Bank, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion. Plaintiffs are not in possession of the Deposit Agreement in place during the timeframe that Community Bank re-sequenced its customers' debit card transactions from highest to lowest dollar amount and, upon information and belief, said Deposit Agreement is in the possession of the Bank.

34.     The Deposit Agreement and, upon information belief, related documents failed to disclose to customers that they had the option to "opt out" from the Bank's overdraft scheme.

C.     **Community Bank's Re-Ordering of Checking Account Transactions**

35.     In an effort to maximize overdraft revenue, Community Bank manipulated and reordered debits from highest to lowest dollar amount during given periods of time.   Community Bank reordered transactions for no reason other than to increase the number of exorbitant overdraft fees it could charge.   This practice violated the consumer protection laws of certain states and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

36.     In addition, Community Bank misled its customers regarding its reordering practices because, upon information and belief, it failed to disclose to customers that the Bank would reorder debit transactions from highest to lowest dollar value.   The Bank's failure to include language regarding its reordering scheme was deceptive and/or unfair because it was, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank grouped together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reordered them so that higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days,

contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations. The Bank's practices thus violated the covenant of good faith and fair dealing implied in the Bank's Deposit Agreement as well as the consumer protection laws of numerous states.

37.     Community Bank's website was littered with deceptive representations. Community Bank claimed that customers could use online banking in order to receive detailed information about their account, including balances and the dates of transactions. Contrary to Community Bank's advertisements and representations, the online account features were not a means by which consumers could gain control of their finances or effectively manage their accounts. In fact, the inaccurate and unreliable information displayed in the online account information on the Bank's website duped consumers into generating overdraft fees for Community Bank.

38.     Transactions involving debit cards used by Community Bank customers, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically. As a result, Community Bank is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

39.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Community Bank's posting system, it failed to post charges in the order in which they were assessed or received. Community Bank developed a policy and employed a practice whereby account charges and debits were posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

40.     Instead of processing such transactions in chronological order or from lowest to

highest, Community Bank processed them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

41.     Community Bank refrained from immediately posting charges to a customer's account as it received them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Community Bank was able to amass a number of charges on the account.  Subsequently, Community Bank posted all of the amassed charges on a single date.  When the group of charges was eventually posted to the customer's account, Community Bank posted them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting resulted in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevented customers from ascertaining the accurate balances in their accounts.

42.     Community Bank's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, was specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise have resulted in such fees.

43.     Community Bank enforced an unconscionable policy whereby charges assessed were posted to customers' accounts in a non-chronological order, from highest to lowest dollar amount, and were held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Community Bank's processing practices substantially increased the likelihood that customers' smaller charges would result in multiple overdraft fees.  The practices provided Community Bank with substantially higher service fee revenues than it would otherwise have achieved absent these practices.

44.     Community Bank also assessed overdraft fees at times when actual funds in the customer's account were sufficient to cover all debits that had been submitted to the Bank for payment. It did this by placing a "hold" on actual funds in the customer's account. In doing so, Community Bank charged overdraft fees where it faced no risk, because the cash balance in the customer's account had not dropped below zero.

45.     A debit card can be used to make a purchase in two ways:  (1) an Automated Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit card and the customer usually is required to sign a receipt. In the former, the money is debited from the account instantaneously. In the latter, the "offline signature" transaction occurs in two parts: first, authorization for the purchase amount is obtained by the merchant. Second, the transaction is not actually "settled" (that is, money between the bank and the merchant does not change hands) until the merchant submits the transaction to the bank sometime after the customer's purchase. Before settlement, "authorization holds" are placed on the customer's account, preventing access to money so held. For some transactions, the authorization hold is for an amount larger than the purchase actually made by the customer. Community Bank charged an overdraft fee when the authorization hold amount—not the purchase price—pushed an account balance into negative territory.

46.     Such "authorization hold" policies, and the extent to which they were used by Community Bank to charge overdraft fees, were inconsistent with Community Bank's Deposit Agreement.

47.     The terms of the Deposit Agreement failed to alert customers that they must often keep a large cushion of funds in their account in order to guard against an overdraft fee even

when customers did not spend more than the funds in their account, and are materially deceptive. Accordingly, Community Bank charged customers overdraft fees even when there were sufficient funds in customers' accounts to cover transactions.

48.  Charging an overdraft fee when in fact an account had never been over-drawn is materially deceptive.  By charging overdraft fees when in fact the customer's account had not been over-drawn, Community Bank breached its contract with Plaintiffs.

49.  As a result, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.  Community Bank's Cloaking of Accurate Balance Information**

50.  Community Bank actively promoted the convenience of its debit cards and other electronic debiting, but failed to provide customers with accurate balance information.  When customers executed account transactions, they generally did not have access to an accurate balance register or balance information.

51.  Community Bank claimed that online banking provides current balance information about customers' accounts.  But in reality, Community Bank's computers were set up not to process transactions in the order received — in "real time," but rather in order from highest to lowest dollar amount so as to ensure that the maximum number of overdraft charges were imposed on customers' accounts.

52.  Community Bank provided inaccurate balance information to its customers through its electronic network.  In certain cases, Community Bank informed its customers that they had a positive balance when, in reality, they had a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

53.  Even when Community Bank had actual knowledge of outstanding transactions

which had already created a negative balance in a customer's account, it encouraged the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

**E.**    **Community Bank's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

54.    At the time its debit cards were used in POS transactions or at ATMs, Community Bank was able to determine, almost instantaneously, whether there were sufficient funds in a customer's account to cover that particular transaction.  The Bank had the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Community Bank could have given customers the option to decline the transaction to avoid incurring the overdraft fee, but it did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

55.    Notwithstanding its technological capabilities and actual knowledge, Community Bank failed to provide notice to Plaintiffs and the Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because Community Bank's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

56.    Community Bank failed to make Plaintiffs and Class members aware that they could opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

**F.**     **Community Bank's Overdraft Policies and Practices Are Contrary to Best Practices**

57.     By engaging in the conduct described herein, Community Bank failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").   A copy of the Joint Guidance is attached as Exhibit A.   These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

58.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

59.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

60.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit B.

61.     Community Bank's overdraft policies made it difficult for customers to avoid injury even if they carefully tracked the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

62.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit C, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

63.    A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



### G.    Community Bank's Unconscionable Provisions and Policies

64.    Community Bank's overdraft policies and practices are or were unconscionable in the following respects, among others:

a.    The Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.    The Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an

overdraft fee;

c.      The Bank did not alert its customers that a debit card transaction will trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreement and related documents, were contracts of adhesion in that they were standardized forms, imposed and drafted by the Bank, which was a party of vastly superior bargaining strength, and only relegated to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees was disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it was not contained in the Deposit Agreement, but rather in a different and separate document, the Disclosures, which were not signed by the depositor; and

f.      The Deposit Agreement provided to customers was ineffective, ambiguous, deceptive, unfair, and misleading in that it did not unambiguously state that the Bank always reordered debits from high to low, even though Community Bank *always* reordered transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

**H.      Recently Announced Changes in Community Bank's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers**

65.      In May 2011, Community Bank ceased reordering customers' debit transactions from highest to lowest dollar value and instead began reversing the order in which the Bank processes customers' debit transactions so that it pays the lowest dollar items presented on the same day first.   Accordingly, Community Bank inserted language into its most recent deposit agreement stating that the Bank processes debit card transactions from lowest to highest dollar value.

66.     However, the order of payment change does nothing to remedy the past wrongs to Plaintiffs and the Classes.  It does not retroactively reverse the charges wrongly debited from their accounts, nor does it prevent Community Bank from resuming its previous unfair and unconscionable methods of business in the future.

I.      **Community Bank's Overdraft Practices Harmed Plaintiffs**

67.     Community Bank's wrongful overdraft policies and practices described above harmed Plaintiffs and members of the Classes.  The following allegations regarding the named Plaintiffs are made for purposes of illustrating the harm and damage sustained by Plaintiffs and members of the Classes as a result of Community Bank's wrongful overdraft policies and practices.

68.     Plaintiffs, William and April Johnson, are current checking account customers of Community Bank.

69.     In connection with their account, the Bank issued a debit card to Mr. and Mrs. Johnson.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

70.     Community Bank wrongfully charged Mr. and Mrs. Johnson multiple overdraft fees on numerous occasions.  For example, Mr. and Mrs. Johnson were charged three overdraft fees on July 26, 2010, in the amount of $32.00 each, for a total of $96.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Community Bank's Reordering Scheme
### (Debits Processed from Highest to Lowest)

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 07/26/2010** |  |  | $426.33 |
| **Date Posted** | **Debit Description** |  |  |  |
| 07/26/2010 | ATM CASH W/D COMMUNITY | 220.00 |  | 206.33 |
| 07/26/2010 | ATM CASH W/D COMMUNITY | 60.00 |  | 146.33 |
| 07/26/2010 | POS PURHCASE WEISMARKE | 58.27 |  | 88.06 |
| 07/26/2010 | POS PURCHASE EXXONMOBIL | 12.07 |  | 75.99 |
| 07/26/2010 | POS PURCHASE MRZ'S | 30.07 |  | 45.92 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 21.40 |  | 24.52 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 25.28 |  | -0.76 |
| 07/26/2010 | OVERDRAFT FEE |  | 32.00 | -32.76 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 12.81 |  | -45.57 |
| 07/26/2010 | OVERDRAFT FEE |  | 32.00 | -77.57 |
| 07/26/2010 | CHK CARD PUR TONY B'S | 10.35 |  | -87.92 |
| 07/26/2010 | OVERDRAFT FEE |  | 32.00 | -119.92 |
|  |  | **Total Fees** | **$96.00** |  |

71.     If Community Bank had not manipulated and reordered Mr. and Mrs. Johnson's transactions from highest to lowest, they would have incurred fewer overdraft fees.

72.     For instance, if Community Bank had posted the transactions from lowest to highest, Mr. and Mrs. Johnson would have incurred only one overdraft fee instead of three:

### Balance Sheet if Debits Were Processed from Lowest to Highest

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 07/26/2010** |  |  | $426.33 |
| **Date Posted** | **Debit Description** |  |  |  |
| 07/26/2010 | CHK CARD PUR TONY B'S | 10.35 |  | 415.98 |
| 07/26/2010 | POS PURCHASE EXXONMOBIL | 12.07 |  | 403.91 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 12.81 |  | 391.10 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 21.40 |  | 369.70 |
| 07/26/2010 | CHK CARD PUR BIGCHIEF | 25.28 |  | 344.42 |
| 07/26/2010 | POS PURCHASE MRZ'S | 30.07 |  | 314.35 |
| 07/26/2010 | POS PURHCASE WEISMARKE | 58.27 |  | 256.08 |
| 07/26/2010 | ATM CASH W/D COMMUNITY | 60.00 |  | 196.08 |
| 07/26/2010 | ATM CASH W/D COMMUNITY | 220.00 |  | -23.92 |
| 07/26/2010 | OVERDRAFT FEE |  | 32.00 | -55.92 |
|  |  | **Total Fees** | **$32.00** |  |

73.     Community Bank's manipulation and reordering of Mr. and Mrs. Johnson's transactions from highest to lowest dollar value greatly increased the number and total amount of overdraft fees charged to Mr. and Mrs. Johnson's account.   Community Bank's reordering scheme resulted in overdraft fees being charged for later, smaller purchases for which sufficient funds existed in Mr. and Mrs. Johnson's account to cover the transactions at the time the transactions were executed.

74.     If Community Bank had not manipulated and reordered Mr. and Mrs. Johnson's transactions from highest to lowest dollar value, and instead posted the transactions from lowest to highest (as it does today), or in chronological order, Mr. and Mrs. Johnson would have been charged fewer overdraft fees.

75.     Community Bank failed to notify Plaintiffs that they could be assessed overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.   In addition, Community Bank never notified Plaintiffs at the time they executed the purported insufficient funds transactions described above, that their checking account was overdrawn or that they would be charged an overdraft fee as a result of the transactions.   Furthermore, Community Bank paid, rather than returned, all of the debit charges described above, even though Plaintiffs' account purportedly lacked sufficient funds to cover the transactions.

76.     Based on information and belief, the overdraft charges assessed Plaintiffs are representative of millions of dollars of overdraft fees that Community Bank wrongfully assessed and deducted from its customers' accounts.   These wrongful takings are especially egregious considering the fact that the Bank knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**J.**      **The Damages Sustained by Plaintiffs and the Classes**

77.      As shown by these examples, Community Bank's overdraft policies made it difficult for a customer to avoid injury even if the customer kept close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id.*

78.      According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

79.      Thus, as a consequence of Community Bank's overdraft policies and practices, Plaintiffs and the Classes have been wrongfully forced to pay overdraft fees.  Community Bank has improperly deprived Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

80.      As a consequence of Community Bank's improper overdraft fees, Community Bank has wrongfully deprived Plaintiffs and the Classes of funds to which it had no legitimate claim.

81.     Plaintiffs had sufficient funds to cover at least some of the transactions for which they and the Classes were charged overdraft fees.  Plaintiffs and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Community Bank could impose these wrongful charges.   In many instances, Community Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

82.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of the National Class)

83.     Plaintiffs repeat paragraphs 1 through 82 above.

84.     Plaintiffs and Community Bank have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in Community Bank's Deposit Agreement and related documentation.

85.     Under the laws of the states where Community Bank does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

87.     Community Bank has breached both the Deposit Agreement and the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

88.     Plaintiffs and members of the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

89.     Plaintiffs and members of the National Class have sustained damages as a result of Community Bank's breach of the Deposit Agreement and the covenant of good faith and fair dealing under the Deposit Agreement.

## SECOND CLAIM FOR RELIEF
### Unconscionability
### (On Behalf of the National Class)

90.     Plaintiffs repeat paragraphs 1 through 82 above.

91.     Community Bank's overdraft policies and practices were substantively and procedurally unconscionable in the following respects, among others:

        a.      The Bank did not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

        b.      The Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

      c.     The Bank did not alert its customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

      d.     The Deposit Agreement and related documents, were contracts of adhesion in that they were standardized forms, imposed and drafted by the Bank, which was a party of vastly superior bargaining strength, and only relegated to the customer the opportunity to adhere to them or reject the agreement in its entirety;

      e.     The amount of overdraft fees was disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it was not contained in the Deposit Agreement, but rather in a different and separate documents, which was not signed by the depositor; and

      f.     The Deposit Agreement provided to customers was ineffective, ambiguous, deceptive, unfair, and misleading in that it did not unambiguously state that the Bank always reordered debits from high to low, even though Community Bank *always* reordered transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

92.     Considering the great business acumen and experience of Community Bank in relation to Plaintiffs and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

93.     The imposition of overdraft charges which exceeded the amount overdrawn (*e.g.*, the imposition of a $32 charge on an overdraft of less than $32) was itself unconscionable. Such

charges were not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank paid the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank did not pay the overdraft).

94.     Plaintiffs and members of the National Class have sustained damages as a result of Community Bank's unconscionable policies and practices as alleged herein.

**THIRD CLAIM FOR RELIEF**
**Conversion**
**(On Behalf of the National Class)**

95.     Plaintiffs repeat paragraphs 1 through 82 above.

96.     Community Bank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

97.     Community Bank has wrongfully collected overdraft fees from Plaintiffs and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

98.     Community Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the National Class, without legal justification.

99.     Community Bank continues to retain these funds unlawfully without the consent of Plaintiffs or members of the National Class.

100.     Community Bank intends to permanently deprive Plaintiffs and the members of the National Class of these funds.

101.     These funds are properly owned by Plaintiffs and the members of the National Class, not Community Bank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the National Class.

102.    Plaintiffs and the members of the National Class are entitled to the immediate possession of these funds.

103.    Community Bank has wrongfully converted these specific and readily identifiable funds.

104.    Community Bank's wrongful conduct is continuing.

105.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the National Class have suffered and continue to suffer damages.

106.    By reason of the foregoing, Plaintiffs and the members of the National Class are entitled to recover from Community Bank all damages and costs permitted by law, including all amounts that Community Bank has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Class)**

107.    Plaintiffs repeat paragraphs 1 through 82 above.

108.    Plaintiffs, on behalf of themselves and the National Class, assert a common law claim for unjust enrichment.

109.    By means of Community Bank's wrongful conduct alleged herein, Community Bank knowingly provided banking services to Plaintiffs and members of the National Class that was unfair, unconscionable, and oppressive.

110.    Community Bank knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Class.  In so doing, Community Bank acted with conscious disregard for the rights of Plaintiffs and members of the National Class.

111.    As a result of Community Bank's wrongful conduct as alleged herein, Community Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Class.

112.    Community Bank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

113.    Under the common law doctrine of unjust enrichment, it is inequitable for Community Bank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the National Class in an unfair, unconscionable, and oppressive manner.   Community Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

114.    The financial benefits derived by Community Bank rightfully belong to Plaintiffs and members of the National Class.   Community Bank should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the National Class all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Community Bank traceable to Plaintiffs and the members of the National Class.

115.    Plaintiffs and members of the National Class have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Pennsylvania's Unfair Trade Practices and Consumer Protection Law
**(On Behalf of the Pennsylvania State Subclass)**

116.    Plaintiffs repeat paragraphs 1 through 82 above.

117.    This claim is asserted on behalf of the members of the Pennsylvania State Subclass under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), PA ST 73 P.S. § 201-1, *et seq.*

118.   Community Bank engaged in unfair and/or deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of the UTPCPL, PA ST 73 P.S. § 201-1, *et seq.*

119.   The UTPCPL, PA ST 73 P.S. § 201-3 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

120.   PA ST 73 P.S. § 201-2(4)(xxi) defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "engaging in any other fraudulent tor deceptive conduct which creates a likelihood of confusion or misunderstanding."

121.   Pursuant to PA ST 73 P.S. § 201-9.2, *et seq.*, Plaintiffs and members of the Pennsylvania State Subclass purchased services, in the form of banking services, from Community Bank that were used primarily for personal, family or household purposes.

122.   Community Bank engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of re-sequencing debit purchases from largest to smallest, and misrepresenting and failing to disclose its policy and practice of re-sequencing debit purchases from largest to smallest in its Deposit Agreement and related documents.

123.   Community Bank also engaged in unlawful conduct in violation of the UTPCPL by making knowing and intentional omissions. Community Bank knowingly failed to disclose its policy and practice of re-sequencing debit purchases from largest to smallest in its Deposit Agreement and related documents.

124.   Community Bank intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that Plaintiffs and all Class Members would continue to incur overdraft fees.

125.   Community Bank's conduct caused Plaintiffs and Class members to suffer ascertainable losses in the form of excessive overdraft fees that, but for Community Bank's unfair and deceptive policy of re-sequencing debit purchases from largest to smallest, would not otherwise have been imposed.

126.   A causal relationship exists between Community Bank's unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class.  Had Community Bank processed debit transactions in chronological order, or in order from lowest to highest (as they do now), Plaintiffs and the Class would not have incurred excessive overdraft fees in violation of the UTPCPL.

127.   As redress for Community Bank's repeated and ongoing violations of the UTPCPL, Plaintiffs and the Pennsylvania State Subclass are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.   Declaring Community Bank's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.   Restitution of all overdraft fees paid to Community Bank by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.   Disgorgement of the ill-gotten gains derived by Community Bank from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated:  July 20, 2012

<table>
<tr><td>

/s/ Kenneth J. Grunfeld
Ruben Honik
PA Attorney ID: 33109
Kenneth J. Grunfeld
PA Attorney ID: 84121
rhonik@golombhonik.com
kgrunfeld@golombhonik.com
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Telephone: (215) 346-7338
Facsimile: (215) 985-4169

*Counsel for Plaintiffs and the Proposed*
*Classes*

</td><td>

/s/ Jeffrey M. Ostrow
Jeffrey M. Ostrow (*pro hac vice to be filed*)
Florida Bar No.: 121452
Jason H. Alperstein (*pro hac vice to be filed*)
Florida Bar No.: 064205
ostrow@kolawyers.com
alperstein@kolawyers.com
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

*Counsel for Plaintiffs and the Proposed*
*Classes*

</td></tr>
</table>